## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Thadeus A. Goodwin
and Patricia C. Goodwin

v.

Hunter's Lodge
Civic Association

August 11, 1993

Case No. C92–612

BY JUDGE WILLIAM H. LEDBETTER, JR.

Two property owners in Hunter's Lodge Subdivision instituted this suit to enjoin the property owners' association from pursuing various contemplated actions, including borrowing money to improve the roads in the subdivision, securing that loan with a mortgage on the common areas and levying special assessments. The complainants contend that amendments to the governing documents that purportedly authorize these actions are invalid.

### Status of the Case

The Goodwins commenced this suit in July of 1992. The Association demurred. After the court overruled the demurrer, the Association filed an answer and cross-bill. In its cross-bill, the Association seeks to enforce its lien for unpaid assessments.

The case was referred to a commissioner in chancery. The commissioner heard evidence on February 23, 1993, and thereafter filed a 35-page report. Both parties filed exceptions. Arguments on the exceptions were heard on July 19, 1993. This opinion addresses all issues.

### Facts

Hunter's Lodge Subdivision was platted and developed in 1976. It consists of 38 lots, each more than five acres, together with private

roads and an eight-acre pond. A "Deed of Dedication and Restrictive Covenants" was recorded on August of 1976.

The pertinent provisions of the original restrictive covenants are as follows: (1) the covenants set forth in that document run with the land for 25 years "or until modified by a vote of 75% of the lots' owners"; (2) a property owners' association, consisting of all lot owners in the subdivision, is to be created for the purpose of maintaining the pond and roads; (3) "maintenance of the roads" shall be the responsibility of the property owners' association; and (4) each lot owner shall pay dues of $25.00 per year to the property owners' association, and unpaid dues "shall be a lien on the lot . . . ."

In the restrictive covenants, the property owners are granted an appurtenant easement for egress and ingress over the roads. According to the recorded plat, each lot extends to the center of the road.

In 1977, the property owners' association, the defendant in this suit, was incorporated as a Virginia non-stock corporation. Its stated purpose is to maintain the roads and common area in the subdivision and to promote recreational facilities for use of the property owners. The number of directors constituting the initial board was three. Bylaws were adopted. The bylaws increased the number of directors to 38 (the number of lots in the subdivision) and provided that the number could be changed only by amendment to the articles of incorporation. Ten directors constitute a quorum. The bylaws provide that the board of directors is responsible for maintenance of the roads and common areas and collection of dues.

The developer of the subdivision completed the roads and covered the surface of the roads with a black material similar to "tar and chip." The treatment was placed on the roads to a width of about 15 feet. Several years later, much of this surface was scraped off because it was breaking up; resurfacing apparently was anticipated.

The Goodwins purchased their lot, Lot 29, in 1976.

In June of 1991, the Association held a meeting, pursuant to notice, for the purpose of modifying bylaws, electing directors, and accepting the developer's deed to the pond. Fourteen persons, constituting a quorum of directors under the bylaws, attended. At the meeting, a new set of bylaws was adopted. The new bylaws reduced the number of directors to 15, with five constituting a quorum for any meeting. The new bylaws also increased the dues and made provision for special assessments.

A few months later, the directors of the Association proposed to the property owners an amendment to the restrictive covenants. According to circulars, the proposed amendment would authorize the Association to borrow money against the common areas (e.g., the pond) if approved by a majority of the property owners. The amendment also provided for an increase in dues and a procedure for levying special assessments.

By April of 1992, more than 75% of the property owners had approved the amendment. The amended restrictive covenants were recorded, along with an affidavit stating that more than 75% of the property owners had approved it as required by the original restrictive covenants.

A month before the Goodwins instituted this suit, the Association imposed a lien against their lot for delinquent dues beginning in 1990.

### Validity of the Amendment to the Restrictive Covenants in 1992

It is said that courts generally disfavor covenants restricting the free use of property. However, in modern times such covenants, along with zoning laws and other public land use regulations, are an accepted part of community life. Their purpose, especially when imposed on defined developments for the benefit and advantage of the landowners within the development, is said to be lawful and laudable. If the restrictions are reasonable, they will be upheld and enforced according to their purposes and design.

Restrictive covenants imposed upon all lots in a subdivision development are normally put there by a common grantor for the purpose of creating and maintaining a general scheme and plan, including provision for amenities, for the benefit of all the lot owners. The covenants are invariably recorded so as to give notice of them to all purchasers, and it is said that such covenants "run with the land." They are often referred to as reciprocal negative easements. Each lot acquires an equitable right to see that everyone else in the subdivision complies with the covenants, and by the same token, each lot is burdened by them. Once the restrictions have attached, they cannot be altered or terminated except by agreement of all parties whose property is affected by them unless the restrictive covenants themselves provide for a different means of alteration or termination.

The Hunter's Lodge Subdivision restrictive covenants contain a provision that "a vote of 75% of the lot owners" may modify the cov-

enants. Thus, the recorded covenants themselves provide for change by "supermajority" rather than unanimity.

The commissioner decided, upon conflicting evidence, that more than 75% of the lot owners in the subdivision approved the 1992 amendment to the covenants. The Goodwins contend that the evidence was insufficient for the commissioner to make such a finding; the defendant argues that the evidence established the approval of 29 of the 38 lot owners.

As for disputed factual issues, where the evidence is taken in the presence of the commissioner, the commissioner's findings are armed with a presumption of correctness where those findings are supported by evidence. *Hill v. Hill*, 227 Va. 569 (1984); *Jamison v. Jamison*, 3 Va. App. 644 (1987). Here, the commissioner's conclusion is supported by the evidence, and the court cannot say that his finding is wrong. He reasonably chose to believe the testimony of the defendant's witnesses who explained how the approvals were obtained and how many were obtained.

Next, the Goodwins complain that the approval did not constitute a "vote" as required by the restrictive covenants. They argue that "vote" contemplates a meeting and some sort of formal expression of a decision by the assemblage. The commissioner reached a different conclusion. He recommended that the word be given its ordinary meaning, synonymous with "approval," and he found that the requisite number of lot owners had approved the 1992 amendment to the restrictive covenants so that the amendment, as recorded, should be considered valid and binding.

In this particular, the commissioner's report is not clothed with a presumption of correctness. This issue involves the application of legal principles, not a factual finding. Nevertheless, the court is of the opinion that the commissioner's conclusion of law is correct. Nowhere in the restrictive covenants is there reference to the requirement of a meeting or any other specific procedure for taking a "vote" of lot owners. Further, as the commissioner points out, a modification of restrictive covenants must be acted upon by the lot owners, not by the Association; hence, the statutes governing decision-making within non-stock corporations are inapposite. Although the directors of the Association took the initiative in formulating and circulating the proposed amendment, it was individual lot owners, acting as lot owners

rather than members or directors of the Association, who were to vote on the amendment.

No authority has been cited, and none can be found, for the proposition that a "vote" of lot owners, within the context of making changes to restrictive covenants of a subdivision, can only be conducted in some particular fashion (e.g., show of hand, balloting, etc.) or only after the persons entitled to vote are formally convened at one place at the same time. A good argument can be made that better decisions result from such a procedure; nevertheless, in this case, it was not required.

Here, the Goodwins were fully aware of the proposed amendment and of the proponents' campaign to have it approved. In fact, the restrictive covenants were amended once before, in 1987, by approval of 75% of the lot owners utilizing the same procedure used in this instance. The Goodwins were among the lot owners approving the earlier amendment.

For these reasons, the court holds that the 1992 amendment to the restrictive covenants was properly voted, and the amendment is valid and binding.

It follows that the Association has the authority to do the things that are entrusted to it by the 1992 amendment to the restrictive covenants.

### Authority to Resurface the Road

The Goodwins contend that the Association's plan to pave the roads is not "maintenance," and thus such work is beyond the scope of authority granted to it by the restrictive covenants.

The 1992 amendment to the restrictive covenants clearly authorizes the Association to pave the roads. The Goodwins' argument assumes that the amendment is invalid and that the provisions pertaining to "road maintenance" in the original covenants apply. For the reasons stated, the amendment is valid and the terms of the amendment apply here.

Even if the Association had to resort to the original restrictive covenants for its authority to pave the roads, the court would agree with the commissioner that "maintenance," giving that word its ordinary meaning, would include the work planned by the Association. Especially considering the history of the surfacing of these roads, resurfacing is "maintenance" whether it be done with asphalt, tar-and-chip, macadam, or some other material.

### Authority to Borrow Money and to Encumber the Common Areas

As noted above, the 1992 amendment to the restrictive covenants expressly authorizes the Association to mortgage the common areas as security for a loan to resurface the roads, provided a majority of the Association approves the loan in a manner described in the amendment. Therefore, the court is of the opinion that the Association has the authority to borrow money and to encumber the common areas for the purpose of paving the roads.

### Validity of the New Bylaws

New bylaws were adopted by the Association on June 29, 1991, at a meeting for which proper notice was given. Although the Goodwins contend that the notice was misleading because it called for a "modification" of the bylaws whereas an entirely new set of bylaws was adopted, the court finds no merit to that argument. The members of the Association were on notice that the Association's bylaws were to be modified at that meeting. The fact that the bylaws were modified so drastically that a new set of bylaws emerged from the meeting is inconsequential.

The court agrees with the commissioner's other conclusions on this subject (pp. 27–29 of the report) and holds that the new bylaws are properly adopted and are now valid bylaws of the Association.

### Imposition of Special Assessments

Again, the court is of the opinion that the 1992 amendment to the restrictive covenants is valid and binding, and as a consequence, the Association has the specific authority to impose special assessments.

### Amount Owing by the Goodwins to the Association

Until the 1992 amendment to the restrictive covenants, the amount of "dues" collectible by the Association was $25.00. Notwithstanding that limitation and the specific language in the original covenants governing the means by which the dues could be increased, the Association billed lot owners for amounts in excess of $25.00 prior to 1992. Until 1990, the Goodwins paid the amounts for which they were billed, even though they exceeded $25.00 in a number of years. They have made no payments since then.

In 1992, the Association recorded a lien against the Goodwins' lot for $800.00, plus late charges and interest for all sums assessed in

1990, 1991, and 1992. In addition, the commissioner found that the Association had a valid claim for the special assessment levied in 1992. The commissioner reached these conclusions by reasoning that all assessments in excess of $25.00 that were imposed prior to the 1992 amendment to the restrictive covenants were unauthorized.

The Association disagrees with the commissioner. It contends that the Virginia Subdivided Land Sales Act and the Virginia Property Owners Association Act permit a property owners' association to levy assessments under the circumstances of this case.

The court agrees with the commissioner. Whether one labels the payments "dues," "assessments," "fees," or whatever, it is obvious that the Hunter's Lodge Subdivision covenants capped such payments at $25.00 per year unless changed by 75% of the lot owners. From a fair reading of the covenants, these "dues' were to enable the Association to maintain the roads and common areas. In the original documents, annual assessments were severely limited, the motivation being, without doubt, protection of the lot owners against the possibility of "open-ended" contributions. The legislation referred to is not designed to override or negate the express provisions in restrictive covenants. *See, e.g.*, Virginia Code § 55–344(C).

Therefore, the court agrees with the commissioner that the Association could levy no more than $25.00 annually until the restrictive covenants were amended in 1992. Accordingly, the amount of the Goodwins' delinquency is $450.00, plus appropriate late charges and interest as calculated by the commissioner. The Association is entitled to a judgment in that amount and, further, is entitled to enforce its lien against Lot 29 for satisfaction of the delinquency.

### Refunds or Credits for Overpayments

As discussed above, the Goodwins paid more than the $25.00 cap for several years prior to 1990 when they ceased making payments altogether. However, they are not entitled to reimbursement for these overpayments for the reasons explained in *Williams v. Consolvo*, 237 Va. 608 (1989).

### Attorney's Fees and Costs

The commissioner's fee of $1,875.00 will be approved. That fee, and all other costs of the proceeding, will be borne by the parties

equally for the reasons explained by the commissioner. No attorney's fees will be awarded.

## Conclusion

The commissioner's report is confirmed, except that portion of it that discusses that efficacy of the amended covenant to subsequent purchasers. Because those conclusions (pp. 20–21 of the report) are not necessary for a decision in this case, the court expresses no opinion on them.